Argument not to exceed 15 minutes per side. Mr. Krim, you may proceed for the appellant. Good morning. Good morning, your honors. I would like to reserve four minutes for rebuttal. Very well. On September 11, 2017, Kenneth M. Scott entered his appearance in this case in the district court. On September 12, 2017, he represented Mr. Jenkins in a revocation hearing in which he was, the facts, the major facts were the facts in this case. The same incident, yes. Yes. And that, while the government characterizes this as excessive representation, I believe it is concurrent representation and the conflict was never brought to the district court's attention. Do you lose if it's successive? Because you basically argue concurrent in your brief and reply and don't talk about strict ones, so I'm curious. I don't know. The major problem is I don't know because the facts have not been developed. And I think that while the request was made for an evidentiary hearing and it was in fact scheduled, that evidentiary hearing never happened. Okay, what facts would you be interested in through an evidentiary hearing that we don't know already? The facts of what happened in the proffer. The information that Mr. Scott had about this case. But wouldn't that information only help Scott in representing Mr. Adams? Yes, it would help Mr. Adams' case. So, I mean, the basis of the concurrent consecutive argument is there's a conflict here. But that is something he uniquely has that an, and I'm not saying he's conflicted, an unconflicted counsel would not have because they wouldn't be sitting in the proffer. And you don't get, if you're defense counsel representing someone, you can't get the proffer of the witness. But the problem is it's where you get the information and what you do. And that's why they danced around at trial the presence of Mr. Jenkins at the scene. At one point the government says, we didn't call Mr. Jenkins. There's some dancing around. I know, but Scott puts the blame on Jenkins. I mean, he sounds like he's representing Adams. The government danced around it. I agree with you. Right, but they don't have the, that's why, we don't know what Scott did and didn't do because Scott never really explained what he did on behalf of Mr. Jenkins or what he did on behalf of Mr. Adams. We know what he did with Adams, don't we? It's in the record. Yes. I mean, we've got the trial, right? But we don't know what happened in terms of Mr. Jenkins. The supervised, the revocation of supervised release hearing is not transcribed? We don't know what he did in working with Mr. Jenkins. Well, we know what he actually did because we read it. And are you saying it's motivations or is internal thinking? I mean, we know what happened, what he did in the representation of both his clients. Well, what we know is he didn't tell Mr. Adams that he had the conflict. I guess he didn't tell anybody, did he? Well, the government knew because the government, at one point, I reread the feeling this morning, and at one point the government put the district court in a very, in my view, a very difficult position because the government lawyer knew and Mr. Scott knew, but Mr. Adams didn't know and the district court didn't know about what was going on. Yes, I understand that. I think we all understand that. I guess my question is, I just keep coming back to this point, is what's the beef? Like, what happened that hurt your client as a result? And your answer really is, I don't know. Yes, because the district court did not inquire of Mr. Scott as he should have. But explain to me what... So what might have happened? Yeah, thank you. Well, he might have explained why he didn't have a suppression hearing on the motion, on the search. What would that... I really didn't have one, I'm sorry. Okay, the record shows that Mr. Scott did not file a motion to suppress the search warrant. And so... You asked me what might show. It might show that the informant might have been Mr. Jenkins. But we know from his representation of Jenkins, the informant wasn't Jenkins. There's no 5K, there's nothing filed supporting that. And the government was adverse to Jenkins in the supervised release hearing. Well, that's... I was asked to speculate on what I thought... That's a lot of speculation. Well, it's not in the record, which is part of why we needed to have that hearing. I know, but you've got to show some level of prejudice now. I think that what I'm... I think what the court should do is send it back to the trial court for the hearing that should have happened on the scope of what Mr. Scott did and didn't do in this case. And I think that the information he got in the proffer... Now I understand the district court's position, which is why hold the hearing if we have no idea if it's going to... It's like a fruitless endeavor at this point. Well, we don't know if it's a fruitless endeavor because, for example, there was no motion to suppress file. Usually when you want a hearing, you say because this is what could come of it, such that... And right now you're saying maybe he would have filed a motion to suppress because another maybe, maybe Jenkins was the informant. Explain to me if Jenkins is the informant, how that would have led someone to file a motion to suppress. Because if you've got an eyewitness that comes in, whether they're the informant or not, and says, look, Adams is dealing drugs out of his basement and he has drugs upstairs, and that would be what an informant would do. And that would provide, with other corroborating evidence, probable cause. Or it also might point out why, because of the evidence... I don't know what would happen in a suppression hearing. I haven't read the affidavit. What's the basis of the affidavit? I'm not sure the affidavit is even in the record. Well, why didn't you get it? You could have got the affidavit. Well, it was not made part of the record, and that's all I relied on. When I was asked to speculate, my client has speculations. Because there was no suppression motion, it was, to my knowledge, not part of the record in this case. The search warrants aren't routinely made part of the record. Having had to search records for search warrants... Why couldn't you get the affidavit pretty easily? I don't know. What? I've never tried to add one to the record. In the past, when I've looked for the search warrant, it's someplace in the record and I get it. But it's not necessarily a public record, an affidavit in a search warrant. The search warrant itself is, but the affidavit is... Adam can get the affidavit, I promise. Right. Oh, yeah. It may be part of the discovery, but it's not part of what I have as the appellate lawyer in the record. But now you're speculating on speculation because you don't even know what's in the affidavit. Yeah, which is why I think we need... Which is why there should have been a hearing at the district court level. Okay. Anything else? No. All right. We'll have your four minutes to rebuttal, Mr. Krim. Ms. Curry, good to see you. Good to see you. May it please the court, Jessica Curry for the United States. This court should affirm, because Adams has not shown a Sixth Amendment violation, there are three sub-issues. First, which standard applies to the asserted conflict, Strickland or Sullivan? Two, can Adams satisfy that standard? And three, is he entitled to an evidentiary hearing? Why not a simple test? Apply Sullivan because there's overlapping days of representation. That way it's a bright-line rule. That bright-line rule would go against the spirit of both Sullivan and the Supreme Court's cautionary language in Mickens, that that test should not be unblinkingly applied. And there is a major difference. It's apparent in our rules of criminal procedure between prior representation and then simultaneous representation. What about a bright-line rule, as your friend on the other side points out, when the government knows but no one else really does? Well, first I would push back on that allegation. Okay. It's raised for the first time on appeal, which I think is telling. There was no argument below that there was no disclosure of the representation. And there's some indications in the record that this was raised. It came up at trial pretty clearly, right, at a sidebar. But what about early on when you appoint Scott? Shouldn't the government say, whoa, whoa, whoa, he's representing Jenkins? Well, there's nothing in the record either way on that. So I don't think we can jump to the conclusion that there was no disclosure. And the overlap was a mere eight days. And it's not a situation of Explain to me, this is the same question I was asking your friend on the other side about the search warrant. Explain to me why, if there's nothing in the record, we can't assume the government didn't bring it up. It seems to me we should be able to assume that if the government, that it would be in the record if the government brought it up. That's fair, Your Honor. If the court were to assume that it wasn't brought up, it still doesn't fit into the analysis for a Sixth Amendment violation. At that point, you're talking about an ethical violation. No, I agree with that. I'm saying concurrent versus consecutive. In other words, we've got overlapping days. You said, no, you can't be unblinking. I'm just adding a factor. And the government knows and doesn't tell. I think the court should at least look to see if there is active representation, despite some overlap. And what we have here is an appearance form on the docket. No dispute about that, before the supervised release violation occurs. But importantly, Adams had appointed counsel all the way back to September 1st. That appointed counsel was conflict-free. There's no dispute about that during this brief period of overlap. And Attorney Scott did not appear on the record on Adams' behalf until after the supervised release violation had already occurred and had concluded. Jenkins had already been sent back to prison for a year. And so both attorneys actually get on the record at an arraignment on the indictment for Adams. And at that point, his appointed counsel says, I need to now withdraw, and files an emergency motion to withdraw. He apparently wasn't aware that Adams had gone out and retained Attorney Scott. And it wasn't until two days after that that the appointed counsel, who was conflict-free, was allowed to withdraw. And at that point, after the supervised release violation had concluded, Attorney Scott officially takes over the representation in Adams' case. So the overlap here, I would say, is, again, very early in the case. It's very brief. It's limited. And there really isn't evidence in our record to conclude that there was active representation on behalf of both clients simultaneously. Do you think what Attorney Scott did here was ethical? I don't know if it was ethical, because if you're going to assume there was no disclosure, I think that does become a problem. It becomes a problem, I would say, more so from Jenkins' standpoint. I think he probably hurt Jenkins more. But is Scott still practicing in the Eastern District of Michigan? I do not know that information. I question whether he should be. Whether or not there's an actual conflict or actual prejudice, there's certainly the appearance of it here. And I think the attorneys have an ethical obligation to avoid the appearance of conflict and prejudice to multiple clients. And you may wish after this case is over to explore that further. The U.S. Attorney's Office, I think, is responsible for helping the court supervise the conduct of members of the bar of the Eastern District of Michigan. And I'm not sure Mr. Scott should be a member anymore. But it's just a suggestion, that's all. Now, so was the jury aware that the prosecution had previously taken the view that the drugs belonged to Jenkins? I don't think in so many words, no, it was not presented that way. But I would say that the position of the government at the supervised release violation was to a less degree. The argument was at most that Jenkins was there. I think the facts do tell us that. And at the violation hearing, the prosecutor there said there was enough evidence by a preponderance that he was in possession. And merely possessing drugs is of course a crime as well. But it was never the position that Jenkins was involved in the distribution activity. This house was a drug house owned and operated by Adams. Evidence of drug trafficking is everywhere in the house. Not just in the basement. And you've got the doctrine of joint and constructive possession, which the jury was instructed on here. And then just as an evidentiary matter, and this is I think an argument that Adams tries to develop, he wanted the jury to be told that his own statements were used at the violation hearing to send Jenkins back to prison. I think you run into a big hearsay problem there. So I don't know how you would have informed the jury of that in a way that would hold up under the evidentiary rules. So therefore I can't really, and Adams doesn't pinpoint any real deficiency at trial. And that's a problem with some of his other arguments as well. He argues that Scott should have objected to testimony from officers that they didn't see anyone leaving or fleeing. What is objectionable about that line of questioning? These are the observations of the officers. That is of course fair game. And one of the defense's theories was that there were people in the house that got away. And they are potentially responsible for the drugs. So exploring whether anyone was seen fleeing was certainly relevant. I want to return to the standard, because it is dispositive here if this court were to apply Strickland. Sullivan itself is a multiple representation case. So the standard was developed with that in mind. The language from that standard also points to its limited application. The attorney has to be actively representing both clients. In Mickens, the Supreme Court stated that the parties there had incorrectly assumed that Sullivan applied and it made clear that that was an open question. Sullivan itself did not support an expansive application. In Moss, this court took seriously the messaging from Mickens. And it was very careful not to unblinkingly apply Sullivan. It only applied Sullivan there because the successive representations shared more than a substantial relatedness. They were nearly identical. They were inextricably linked. The defendants were charged in the same criminal indictment for the same drug conspiracy. They were tried in front of the same jury. They collaborated on their defense. And there was a fee arrangement in which the former client was paying legal fees for the current client. And this court concluded properly that that really was tantamount to a situation of multiple or successive representation here. I mean, you do argue that you win under either standard, don't you? Yes, Your Honor. Isn't that the easier route for us to affirm? You know, we need not decide this. Either way, we find that there's no reversible error. That is one option. And it is easy in that sense. You can avoid the threshold question for the reasons that we've provided in our brief. I think there is reason, though, to consider addressing the standard head-on in this case for two reasons. Number one, Adams doesn't argue actual prejudice. So if this court applies Strickland and decides that that is the standard that applies to this situation, you can just do the legal analysis, end there, and it wouldn't have to grapple with the various probable outcomes of the claim deficiencies. In addition, it would contribute to the body of law. Both standards require an adverse effect on representation, do they not? They do. There is. If Scott, despite his conflicts or potential conflicts, his performance did not adversely affect the representation, I mean, game's over, right? I agree with that. The game would be over and is because there's no adverse effect. Very clearly from this record, you can see that there was no missed impeachment opportunity with Officer Egan. It was the original claim below. Scott did go after Jenkins in a very real way here. Yeah, I read it. He developed that theory with multiple witnesses, not just Egan. Scott even called defense witnesses specifically. Charles Kirk was called. Kirk testified. He was in the basement. In fact, Jenkins stayed in the basement longer. Although Kirk did not see Jenkins running from the home, he thinks he heard the back door. That theory was left open. The police hadn't surrounded the back area. There was this opening to pursue the theory that Jenkins was there and got away. Scott did everything he could with the record in that respect and pieced the testimony together in closing in a way that was I think as good as you can do on this record. Although the jury rejected that theory or perhaps didn't think it negated the guilt of Adams, that does not make out a Sixth Amendment violation. This court also doesn't need to remand for an evidentiary hearing. It's a discretionary decision. The district court had everything that it needed to resolve that question on the issue before it. This court shouldn't entertain new reasons for an evidentiary hearing here either. Those could be developed perhaps in collateral proceedings. For all these reasons, the government respectfully requests that this court affirm. Any questions of Judge White? Four minutes for rebuttal. The question is whether or not the judge should have had a hearing and at least an explanation from Scott about his representation of both defendants. Frankly, many of the cases, several of the cases the government cites for no hearing are cases in which there has been a hearing at the trial level. My favorite one they quote is Enoch versus Grimland because that case points out what I think an ethical lawyer should have done. In that case he did it. He did it in the state trial court. The state trial court made the revelations and because it was done properly at the state trial court level, he was not entitled under EBBA to a federal habeas hearing. But that doesn't mean that the district court did not abuse its discretion in refusing to inquire into that scope of relationship. They scheduled it for a hearing but it didn't happen. Alright, anything further? No, Your Honor. Alright, thank you very much for your arguments. The case will be submitted.